# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1855 | **DATE** | 12/11/2002 |
| **CASE TITLE** | Barry Hackner vs. Long Term Disability Plan | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| ✓ No notices required, advised in open court. | | | |
| No notices required. | number of notices | | |
| Notices mailed by judge's staff. | DEC 1 2 2002 | | 42 |
| Notified counsel by telephone. | date docketed | | |
| Docketing to mail notices. | | | |
| Mail AO 450 form. | docketing deputy initials | | |
| Copy to judge/magistrate judge. | | | |
| SLB | courtroom deputy's initials | date mailed notice | |

U.S. DISTRICT COURT
CLERK

02 DEC 11 PM 5: 17

FILED-ED 10

Date/time received in central Clerk's Office

mailing deputy initials

BARRY HACKNER, )
)
    Plaintiff, )
)
    v. )
)
LONG TERM DISABILITY PLAN FOR )
EMPLOYEES OF THE HAVI GROUP LP and )
HARTFORD LIFE AND ACCIDENT )
INSURANCE COMPANY, )
)
    Defendants. )

No. 02 C 1855

Judge John W. Darrah

DOCKETED
DEC 1 2 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, Barry Hackner ("Hackner"), filed suit against Defendants, Long Term Disability Plan for Employees of the Havi Group LP ("Plan") and Hartford Life and Accident Insurance Company ("Hartford"), alleging violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). Presently before the Court are the Plan's and Hackner's Motions for Summary Judgment.

In its reply memorandum, the Plan moves to strike the Plaintiff's Response to Defendant's Statement of Material Facts in its entirety for failing to comply with the Local Rule. In the alternative, the Plan moves to strike the portions of the Response that fail to comply with the Local Rule.

A party opposing a motion for summary judgment must serve and file, in response to the movant's Local Rule 56.1(a)(3) statement of undisputed facts, "a response to each numbered paragraph in the moving party's statements, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...."

The material facts set forth by a moving party are deemed admitted unless controverted by the statement of the opposing party. N.D. Ill. R. 56.1(b)(3)(B); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995).

Several of Hackner's responses to the Plan's statements of facts fail to comply with the Local Rule. Those responses are improper and are stricken.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Hackner is a participant in an ERISA-governed employee welfare benefit plan established by his employer, the Havi Group L.P. ("Havi"), through its purchase of group insurance issued by Hartford. (Def,'s 56.1(a)(3) Statement ¶ 5). Under the Plan, long-term disability benefits are payable to eligible participants in accordance with the Plan's terms, conditions, limitations, and exclusions. (Id., at ¶ 6). According to the Plan, Hartford "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy". (Id., at ¶ 7).

The Plan defines "Total Disability" as:

Totally Disabled means that:

2

> (1) during the Elimination Period; and
> (2) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation of work for which you are or could become qualified by: (1) education; (2) training; or (3) experience.

(Def.'s 56.1(a)(3) Statement ¶ 8).

Under the Plan if a participant is disabled because of mental illness, "subject to all other Policy provisions, benefits will be payable" when the participant is not confined "in a hospital or other place licensed to provide Medical Care," for a lifetime total of 24 months. (Def.'s 56.1(a)(3) Statement ¶ 9). The Plan defines "Other Income Benefits," in part, as: "The amount of disability or retirement benefits under the United States Social Security Act to which you may be entitled because of your disability or retirement," and "If Family Social Security is included in your Plan of Insurance, the amount of disability or retirement benefits under the United States Social Security Act to which your spouse and children may be entitled because of your disability or retirement." (Id., at ¶ 10).

The Plan's "General Provisions" provide, in part, that "Family Social Security" is included in the definition of "Other Income Benefits". (Def.'s 56.1(a)(3) Statement ¶ 11). The Plan's "Calculation of Monthly Benefit" provision subtracts, in part, all "Other Income Benefits". (Id., at ¶ 12). Benefit payments cease "on the first to occur of : (1) the date you are no longer Disabled; (2) the date you fail to furnish proof that you are continuously Disabled...." (Id., at ¶ 13). The Plan further provides that "Hartford reserves the right to determine if Proof of Loss is satisfactory". (Id., at ¶ 14).

Hackner worked for the Havi Group as a manager of PC Services until approximately

December 30, 1996. (Plaint.'s 561.(a)(3) Statement ¶ 10). In September of 1996, Hackner had filed for disability due to severe depression. (June 21, 2000 Statement by Hackner to Hartford investigator). Hackner began receiving long-term disability benefits under the Plan on March 3, 1997. (Def.'s 56.1(a)(3) Statement ¶ 15). Hartford found that Hackner became disabled on September 3, 1996, as a result of depression and coronary artery disease status post-coronary artery bypass graft. (Plaint.'s 56.1(a)(3) Statement ¶ 56). Hartford began paying Hackner benefits at the rate of approximately $3,825 per month. (Id., at ¶ 58). Hackner continued to receive long-term disability benefits through March 2, 1999. (Def.'s 56.1(a)(3) Statement ¶ 16).

On March 11, 1997, Hackner was admitted to the Evanston Hospital with angina. He underwent coronary artery bypass grafting times three with left internal mammary artery on March 13, 1997. (Plaint.'s 56.1(a)(3) Statement ¶ 12). A diagnostic radiology in March 1997 showed bibasilar linear opacities consistent with atelectasis or inflitrates. There were also small pleural effusions. (Id., at ¶ 13).

Diagnostic radiology performed on Hackner's shoulders in October 1997 showed advanced tendinopathy of the supraspinatus tendon with findings raising concern for a partial tear along the articular surface, extending into the substance of the supraspinatus tendon. There was also tendinosis of the subcapularis tendon; moderately large right shoulder joint effusion, osteoarthritic changes of the acromioclavical joint, producing direct abutment of the musculotendinous portion of the supraspinatus; degeneration and/or tear of the anterior glenoid labrum. (Plaint.'s 56.1(a)(3) Statement ¶ 14).

On October 24, 1997, Dr. Tom A. Karnezis ("Dr. Karnezis"), an orthopedic surgeon,

examined Hackner, who was then three-months post-open cardiac bypass. Hackner had developed right shoulder pain and occasional left shoulder pain. The pain was significant, interfering with his sleep. An MRI revealed a large acromioclavicular arthropathy with advanced tendinopathy to the rotator cuff and a high probability of a full thickness or partial thickness tear at the level of the insertion of the rotator cuff. Dr. Karnezis's impression was a small tear of the labrum as well as an intra-articular effusion of the right shoulder. (Plaint.'s 56.1(a)(3) Statement ¶ 15). On November 14, 1997, Dr. Karnezis's diagnosis was tendinosis rotator cuff, no full tear, impingement syndrome, rotator cuff syndrome stage II. (Id., at ¶ 16). As a result of these findings, Hackner underwent a right shoulder arthrosporic decompression of the subacromial space as well as distal clavicle resection. The post-operative diagnosis was tendinosis rotator cuff, no full tear, impingement syndrome, rotator cuff syndrome stage II. (Id., at ¶ 17).

On February 25, 1998, Dr. Karnezis examined Hackner, who was almost three-and-a-half months post-surgery to his right shoulder. Hackner continued to experience pain and limitation of motion, particularly on internal rotation and slightly on forward flexion. (Plaint.'s 56.1(a)(3) Statement ¶ 19). Hackner saw Dr. Karnezis again in November 1998 for left shoulder pain. (Id., at ¶ 21).

In June 1998, Hartford received a report from Dr. Stephen Cherniak ("Dr. Cherniak"), Hackner's psychiatrist, who diagnosed depression, anxiety, and poor concentration. At that time, Hartford concluded that Hackner remained totally disabled. (Plaint.'s 56.1(a)(3) Statement ¶ 20).

According to the Plan, in order for Hackner to receive long-term disability benefits beyond March 3, 1999, in light of the twenty-four-month lifetime limitation of benefits available for mental illness, Hackner must have been prevented by "Disability from doing any occupation

or work for which [he is] or could be qualified by training, education, or experience. (Def.'s 56.1(a)(3) Statement ¶ 17). Hartford approved Hackner's long-term disability benefits beyond March 3, 1999, because he was unable to work in any capacity while he was recovering from his shoulder surgery. (Id., at ¶ 18).

On March 31, 1999, Dr. Karnezis wrote to Hartford to update his medical status. Dr. Karnezis wrote that physical limitations from both shoulders continued to exist and that Hackner had difficulty in forward flexion and in external rotation. Any prolonged use of his shoulders, either at a computer or with overhead activities, was extremely bothersome. The pain Hackner was experiencing was both subjective and objective. (Plaint.'s 56.1(a)(3) Statement ¶ 63).

On July 8, 1999, Hackner saw Dr. Karnezis due to pain in his shoulders that radiated down his arm. Dr. Karnezis diagnosed that Hackner might have had a previously unnoticed partial rotator cuff tear. (Plaint.'s 56.1(a)(3) Statement ¶ 22). On July 12, 1999, Hackner underwent an ultrasound of both shoulders. Findings of the exam showed inflammatory changes, particularly immediately superior to the acromion. The findings on the left side were most consistent with a stage I impingement syndrome. (Id., at ¶ 23).

On July 20, 1999, Dr. Karnezis again wrote to Hartford regarding Hackner's physical impairments. He stated that Hackner "continues to have difficulty with both shoulders," including difficulty in achieving the last several degrees of active motion. He suspected a possible deltoid muscle rupture from the area of repair. Hackner's left shoulder pain was consistent with impingement tendonopathy. Hackner was unable to use both shoulders and was unable to perform activities over his head. Performing activities close to his body was also

difficult because the weight of his arm placed traction across the AC joint and reproduced his symptoms. Hackner reported that he frequently awoke at night and described the pain as being 7 to 10 out of a 10 scale on his left side. Hackner also had difficulty driving a car and turning the steering wheel due to his discomfort. (Plaint.'s 56.1(a)(3) Statement ¶ 65.)

In August 1999, Hackner received approximately $24,000 in Social Security disability benefits that were effective retroactively from March 1, 1998 through August 1999. (Def.'s 56.1(a)(3) Statement ¶ 19). The Social Security Administration later adjusted Hackner's disability onset date to March 1, 1997 and awarded him additional disability benefits of $15,000 in additional disability benefits retroactively from March 1, 1997 through February 1998. (Id., at ¶¶ 21, 84). The Social Security Administration also awarded dependent disability benefits from March 1, 1997 through July 31, 1998, in the amount of approximately $11,000. (Id., at ¶¶ 22, 85).

That same month, Hartford informed Hackner that as of May 20, 1999, the definition of disability which he must meet for benefits to continue would include being prevented by disability from doing any occupation or work for which he was or could be qualified by training, education, or experience. (Plaint.'s 56.1(a)(3) ¶ 39; Aug. 4, 1999 Letter).

In October 1999, Hartford informed Hackner that he had been overpaid in the amount of $22,865.06 because of his receipt of Social Security benefits payment. Hartford acknowledged receipt of $22,865.06 from Hackner to reimburse the overpayment. (Plaint.'s 56.1(a)(3) Statement ¶ 59).

Also, in October 1999, Hackner was examined by Dr. James S. Grober ("Dr. Grober"), a rheumatologist. Hackner complained of right hand pain, swelling and stiffness, bilateral shoulder

pain, occasional back spasms, nocturnal calf cramps, and right olecranon bursa swelling. (Plaint.'s 56.1(a)(3) Statement ¶ 25).

In January 2000, Hackner was seen by Dr. Grober because of increased back pain and bilateral shoulder pain. Hackner was one-month post shoulder surgery by Dr. Palutsis ("Dr. Palutsis"). Hackner was unable to walk more than one block because of severe back spasms. Dr. Grober's impression was lumbar strain/back muscle spasms, scoliosis and deconditioning bilateral shoulder pain, and osteoarthritis of the hands. (Plaint.'s 56.1(a)(3) Statement ¶ 27). In February 2000, Dr. Thomas H. Hudgins ("Dr. Hudgins") examined Hackner. Dr. Hudgins' impression was right upper extremity acromioclavicular joint pain secondary to osteoarthritis, status post acromioplasty, mild upper extremity rotator cuff impingement secondary to glenohumeral instability, and posterior element low back pain. (Id., at ¶ 28). That same month, Hackner was examined by Dr. Justina Tanhehco, whose impression was chronic pain syndrome and status post depression. (Id., at ¶ 29).

In March 2000, Dr. Hudgins examined Hackner, finding that he was unable to tolerate the exercise program prescribed by his physical therapist. Dr. Hudgins' impression was posterior element low back pain and status post right upper extremity acromioplasty. (Plaint.'s 56.1(a)(3) Statement ¶ 31). Hackner's physical therapist diagnosed Hackner as having low back pain and right upper extremity AC joint osteoathritis. (Id., at ¶ 30). An April 2000 MRI showed degenerative changes in the lumbar spine, including bulging discs. (Id., at ¶ 32).

In May 2000, Hartford advised Hackner that he was overpaid an additional $26,232.56 in light of the receipt of certain Social Security disability benefits. Hackner made a payment of

$18,732.56 in July 2000 to Hartford for this overpayment. In total, Hackner repaid Hartford $41,597.62. (Plaint.'s 56.1(a)(3) Statement ¶ 59).

In July 2000, Hackner discussed with Diane Polman ("Polman"), a Hartford Rehabilitative Case Manager, some of his requests for Hartford to pay for adaptive equipment to assist him with his return-to-work efforts. (Def.'s 56.1(a)(3) Statement ¶ 24). Polman requested an assessment review from a Hartford Clinical Specialist in order to determine whether to fund the requested adaptive equipment. (Id., at ¶ 25). Later that month, a Clinical Specialist, who is a nurse, reviewed and assessed Hackner's file. (Id., at ¶26). The specialist concluded, in part, that there did not appear to be any support of Hackner's total disabilities claim with respect to sedentary occupations because Hackner stated that his symptoms were relieved with sitting and that the restriction of movement of his shoulder did not radiate to his lower arm or neck. (Id., at ¶ 27). The specialist also noted that Hackner had an extensive work history that would allow for sedentary work, that he first began complaining of physical symptoms at the end of the 24-month period for which he received long-term disability benefits for depression, and that his physical symptoms were otherwise in control. (Id., at ¶ 28).

Hackner also requested financial assistance by Hartford in July 2000 in his attempt to return to work. (Def.'s 56.1(a)(3) Statement ¶ 29). Hackner wrote Polman, in part, that he was "reluctant to ask for much as you and Hartford have been so great, I felt I was taking advantage of you." (Id., at ¶ 30). Hackner requested reimbursement from Hartford for the cost of office equipment, a new mattress, membership to a health club, memberships to various organizations related to job searches, research materials, and a web design course. (Id., at ¶ 31).

On August 10, 2000, Hartford spoke with Dr. Hudgins about Hackner. Dr. Hudgins

9

thought Hackner could perform a sedentary job when he saw him in February of 2000. (Def.'s 56.1(a)(3) Statement ¶ 33). Dr. Hudgins did not think that Hackner needed any ergonomic changes in order to perform a sedentary job and confirmed that in, February 2000, Hackner's physical symptoms were relieved with sitting. (Id., at ¶¶ 34-35). That same month, Hackner was examined by Dr. Paulitsis. The examination found Hackner diffusely tender in the subcromial bursa area across the top of the shoulder to the AC joint. Hackner was demonstrating positive impingement signs with forward flexion and internal rotation. He had pain throughout the range of motion and pain against resisted rotator cuff and deltoid strength testing. He was treated as a chronic pain syndrome patient with medications and with a prolonged rehabilitation program. (Plaint.'s 56.1(a)(3) Statement ¶ 33). Dr. Paulitsis deferred to Dr. Hudgins regarding Hackner's capacity to return to work. (Def.'s 56.1(a)(3) Statement ¶ 36).

In September 2000, Hartford spoke with Dr. Jaffe ("Dr. Jaffe"), who saw Hackner earlier that same month. (Def.'s 56.1(a)(3) Statement ¶ 37). Dr. Jaffe felt that Hackner was physically capable of sedentary work duties but that his psychiatric impairments largely limited his ability to work (Id., at ¶ 38). Dr Jaffe recommended that Hartford consult with Hackner's psychiatrist regarding Hackner's psychiatric impairments. (Id., at ¶ 39). Hartford did not consult Hackner's psychiatrist because Hackner met the Plan's 24-month lifetime limitation for payment of disability benefits based on mental illness. (Id., at ¶ 40).

In late September 2000, Polman evaluated Hackner's file to determine whether there were any sedentary occupations that Hackner would be capable of performing, based on Hackner's education, training, and work history,. (Def.'s 56.1(a)(3) Statement ¶ 41). Hackner's past work experience included: internal consultant; internal PC troubleshooter and support;

independent marketing management consultant; self employed; Vice President, Sales and Marketing for a company in legal and tax publications; and Vice President, National Marketing Support for a life insurance company. (Id., at ¶ 42). Hackner had also reported that he had a consulting business and reported the income from the business to Hartford. (Id., at ¶ 43).

Based on the review, Polman determined that Hackner would be capable of performing the following occupations similar to his work history and with wages above his monthly benefit amount: User Support Analyst, Market Research Analyst I, Consultant, Director, Research and Development, Vice President (any industry). (Def.'s 56.1(a)(3) Statement ¶ 44). Effective September 25, 2000, Hartford terminated Hackner's long-term disability benefits because it concluded that the medical evidence did not support his claim that he was totally disabled from any occupation because of his physical conditions and because there were several sedentary occupations he could perform. (Id., at ¶ 45). On October 19, 2000, Hartford notified Hackner of the termination of his disability benefits. (Id., at ¶ 46).

In November 2000, Hackner's attorney sent Hartford a notice of appeal of the termination decision and the Social Security benefits offset decision. (Def.'s 56.1(a)(3) Statement ¶ 47). Hackner's attorney noted on April 13, 2000, Hartford sent a letter to Hackner advising him that a review of his claim was complete and that Hartford determined that he remained totally disabled as defined in the policy; thus, there was no basis for the sudden termination of benefits. (Plaint.'s 56.1(a)(3) Statement ¶ 71). In December 2000, another MRI showed the same abnormalities as the April MRI – degenerative changes of the lumbar spine with bulging discs. (Plaint.'s 56.1(a)(3) Statement ¶ 34).

In January 2001, Dr. Richard Blonsky ("Dr. Blonsky"), the Director of Neurology and

Pain Medicine at the Pain & Rehabilitation Clinic of Chicago, examined Hackner and reviewed his medical records. He noted that Hackner's "stamina is drastically reduced, even simply sitting and working at a computer. He shops for groceries once a month for about half an hour, after which he is exhausted". Dr. Blonsky further reported that Hackner's issue of low back pain seemed to develop promptly with sitting, standing or walking. Hackner also suffered from knee pain. Dr. Blonsky concluded that Hackner suffered from myofascial pain syndrome affecting the lumbar musculature, which is a source of chronic low back pain. He found pain in both knees in the infrapatellar region, suggestive of a possible chrondomalacia patellae. Altered sensory findings were also suggestive of a diabetic polyneuropathy, probably in the early stages, which would likely continue to worsen with the passage of time. In addition, Hackner continued to demonstrate bilateral shoulder degenerative changes resulting in two operations on the right shoulder, which was reflected in the diminution of mobility at that joint in comparison to the left. Dr. Blonsky also recorded restricted range of motion in the lumbar area, a finding consistent not only with myofascial pain as a limiting factor but also highly suggestive of degenerative changes in the lumbar spine. (Plaint.'s 56.1(a)(3) Statement ¶ 35).

According to Dr. Blonsky, Hackner was never sufficiently rehabilitated or restored to a diminished pain level sufficient to allow him to function in a normal fashion. He opined that Hackner's physical changes were sufficient to justify Hackner's continuing disability since it was unlikely that he would be capable of successfully obtaining or maintaining a job in the competitive work place. (Plaint.'s 56.1(a)(3) Statement ¶ 35). Hackner's "final appeal" submitted on March 23, 2001, included the above narrative report by Dr. Blonsky. (Def.'s 56.1(a)(3) Statement ¶ 48).

In March 2001, Hackner's attorney wrote to Hartford to explain what was believed to be a miscalculation of the amount of overpayment. (Plaint.'s 56.1(a)(3) Statement ¶ 59). The letter explained that Hackner had been charged twice for overpayment and that because he did not list his son as a dependent on his tax returns, the policy did not allow Hartford to recoup benefits paid on account of his son in addition to Hackner's own benefits. Hackner's son did not constitute a "dependent" because his son was not in custody or control, payments went directly to his son, and he did not list his son as his dependent on his tax return. (Id.,at ¶ 74).

In April 2001, Hackner returned to Dr. Grober for a follow-up with concerns of persistent low back pain, bilateral shoulder pain, right hand pain with some swelling, and swelling of the right knee with redness. (Def.'s 56.1(a)(3) Statement ¶ 37).

After receiving Hackner's appeal, Hartford requested Dr. George Kazda ("Dr. Kazda") of the Medical Advisory Group, review the evidence of Hackner's file, as well as the new medical information Hackner submitted. (Def.'s 56.1(a)(3) Statement ¶ 54). In early May 2001, Dr. Kazda submitted a report in which he acknowledged the reports of non-specific chronic pain, as well as Hackner's physician's opinions that Hackner could perform a sedentary occupation. (Id., at ¶ 55). Dr Kazda stated, "Dr. Blonsky, in my opinion, did not identify any objective evidence or abnormalities that would preclude engagement in [a] sedentary occupation." (Id., at ¶ 56). Dr. Kazda concluded, "Based on the available medical information and interview with Dr. Hackner's physicians, it is my opinion that, despite the presence of non-specific chronic pain syndrome, Mr. Hackner retains the physical functional capacity to engage in [an] occupation at the sedentary category as defined by the [Dictionary of Occupational Titles]." (Id., at ¶ 57).

On May 22, 2001, Hartford upheld its termination and Social Security benefit offset

decisions. (Def.'s 56.1(a)(3) Statement ¶ 58). Hartford noted, in part, that "Mr. Hackner has performed a consulting business from his home and reported attendance to 22 seminars related to his business." (Id., at ¶ 59). Hackner's attorney appealed this decision. (Id., at ¶ 61).

That same month, a radiopharmaceutical exam of Hackner showed several areas of probable arthritic change and that reflex sympathetic dystrophy without the classical findings could not be excluded. (Plaint.'s 56.1(a)(3) Statement ¶ 38).

In June 2001, Hackner submitted a report from Dr. Cherniak for Hartford's review. (Def.'s 56.1(a)(3) Statement ¶ 62). The report indicated that Dr. Cherniak had reviewed a report prepared by Jody Wilkens "(Wilkens"). Dr. Cherniak found that Wilkins improperly concluded that Hackner "continues to have ongoing psychological issues further aggravated by family-related stress". Dr Cherniak found this statement to be without merit because Hackner's anti-depressant drug had been reduced over the last three months and that he no longer took another medication. Dr. Cherniak also responded to Wilkins' note regarding Hackner's attendance at seminars being inconsistent with his complaints by pointing out that Hackner's seminar attendance was severely restricted and that he often left early or failed to attend the seminars due to pain. (Plaint.'s 56.1(a)(3) Statement ¶ 39).

That same month, x-rays of Hackner showed mild to moderate osteoarthritis of the hip joints bilaterally. There was mild osteoarthritis of the sacroiliac joint bilaterally and symphysis pubis. (Plaint.'s 56.1(a)(3) Statement ¶ 40). Dr. Carlos Escamilla reviewed an MRI of Hackner's right knee and found the main abnormality to be "changes in the posterior half of the medial meniscus, degenerative in nature, with a questionable tear reaching the tibial surface in this meniscus". (Id., at ¶ 41). Dr Thomas Cronin reviewed an MRI of Hackner's right hand and

found a cyst in the head of the third metacarpal bone. (Id., at ¶ 42).

On June 19, 2001, Hackner returned to Dr. Grober for a follow-up to persistent pain. Dr. Grober's impression was right hand pain/swelling, bilateral knee pain, chronic pain syndrome, bilateral shoulder pain, and osteoarthritis of the spine. (Plaint.'s 56.1(a)(3) Statement ¶ 43). A June 29, 2001 electromyogram needle exam showed bilateral local cervical paraspinal root irritation. (Id., at ¶ 44).

On July 16, 2001, Dr. Grober entered an interim note to summarize recent diagnostic test results. His diagnostic impression at that time was osteoarthritis, bilateral hips and sacroiliac joints, right knee osteoarthritis versus meniscal tear, hand pains of unclear etiology, chronic pain syndrome, bilateral shoulder pain, status post right acromioplasty times two, and osteoarthritis of the spine. (Plaint.'s 56.1(a)(3) Statement ¶ 45). On July 23, 2001, Dr Grober examined Hackner and found that he suffered from left knee pain, chronic pain syndrome, and osteoarthritis of the spine and hips. He opined that Hackner's symptom pattern and exam findings support myofascial knee pain. (Id., at ¶ 46).

On August 14, 2001, Hackner's attorney submitted treatment notes from Dr. Grober dated April 2, 2001, June 19, 2001, July 16, 2001, and July 23, 2001; hip radiographs from June 19, 2001; MRIs of the knees from June 22, 2001; physical therapy notes from November 1, 2000 through December 5, 2000; case law; and Social Security rulings. (Def.'s 56.1(a)(3) Statement ¶ 63). Dr. Kazda again reviewed all of the information in Hackner's file, as well as additional documentation provided by Hackner's attorney. (Id., at ¶ 64).

In October 2001, Dr. Kazda reported that the information did not support the presence of a condition severe enough to preclude Hackner from returning to work in any occupation.

15

(Def.'s 56.1(a)(3) Statement ¶ 65). Dr. Kazda noted that there was no indication that "there had been any significant attempt to overcome any deconditioning that [Dr. Grober] stated was present". (Id., at ¶ 66). Dr. Kazda acknowledged that Dr. Grober previously indicated that Hackner's condition would not prevent his return to work in a sedentary occupation. (Id., at ¶ 67). Dr. Kazda disagreed that Hackner had physical changes sufficient to justify continued disability. (Id., at ¶ 68). That same month, Hartford upheld its May 22, 2001 decision. (Id., at ¶ 69).

In November 2001, Hackner's attorney requested another appeal. Hackner's appeal noted that he believed that Hartford ignored objective evidence of MRI and EMG/NCV and that Hackner had participated in physical therapy as prescribed but that it had failed to restore him to employability. (Plaint.'s 56.1(a)(3) Statement ¶ 81).

On January 22, 2002, Paula J. Doll ("Doll") of Hartford recommended limitations of "avoiding sustained overhead work, avoiding overhead lifting and avoiding repetitive reaching above the shoulders". She also recommended a limitation of Hackner's right hand to "no repetitive/sustained firm gripping and avoiding work that requires fine motor activity combined with speed/meeting quotas, i.e. assemble while seated." Additional limitations included "avoid prolonged static posturing, esp[ecially] w[ith] the neck held in flexion, and ideally work in [a] job that allows change of position as needed." (Plaint.'s 56.1(a)(3) Statement ¶ 82). On January 24, 2002, Hartford upheld its decision to terminate Hackner's benefits beyond October 21, 2000. (Def.'s 56.1(a)(3) Statement ¶ 71). Hartford acknowledged Dr. Cherniak's and others' reports that Hackner had chronic pain but explained that the medical evidence did not support the claim that such pain prevented him from working in any capacity. (Id., at ¶ 73). Hartford also

noted that it received medical documentation regarding medical treatment Hackner received after the termination of benefits. (Id., at ¶ 74). However, Hartford could not consider documents submitted on appeal which pertained to events that occurred after the termination did not find, based on a review of the medical documentation, that Hackner complained of significant hip and knee pain or pain with sitting until after his benefits had been terminated. (Id., at ¶ 75).

The affirmation of the denial of benefits noted that medical records showed that, in February 2000, Hackner reported "no discomfort with sitting and actually feels better with sitting and leaning forward," and that a rehabilitation specialist noted that Hackner "is able to sit comfortably and is able to sleep without any low back pain". The same report also indicated that Hackner had multiple complaints of pain, right shoulder pain, low back pain, chronic discomfort, standing for prolonged periods (15-20 minutes) exacerbates discomfort and ambulation, right ankle fracture, and that medications did not provide any relief from his discomfort. (Def.'s 56.1(a)(3) Statement ¶ 77; Plaint.'s Response).

As to the alleged overpayments, Hartford explained that, according to the "Other Income Benefits" section of the Plan, Hartford was entitled to offset Hackner's disability benefits by the Social Security benefits his child received due to his disability. (Def.'s 56.1(a)(3) Statement ¶ 83).

The denial of benefits challenged under Section 1132(a)(1)(B) is reviewed *de novo* unless the benefit plan gives the fiduciary or administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103 (1989) (*Bruch*). If the plan confers power on the administrator to exercise discretion, the Court's review is the deferential "arbitrary and capricious" one. *Bruch*,

17

489 U.S. at 111; *Reich v. Ladish Co.*, 306 F.3d 519, 524 (7th Cir. 2002). However, a higher standard of review may occur if the claimant establishes an actual conflict of interest to show actual bias. *See Mers v. Marriott Inter'n Group Accidental Death & Dismemberment*, 144 F.3d 1014, 1020 (7th Cir. 1997) (*Mers*). The Court presumes that a fiduciary is acting neutrally unless a claimant provides specific evidence of actual bias that there is a significant conflict; a potential conflict is not sufficient. *See Mers*, 144 F.3d at 1020.

The parties do not dispute that the Plan of the instant case expressly grants Hartford discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Plan. However, Hackner argues that this Court should review the denial of benefits under a higher standard of review because Hartford has an inherent conflict of interest as both payor of claims and adjudicator of claim eligibility. Hackner asserts that evidence of insurer bias includes the timing of the termination and the lack of evidence of any material improvement in Hackner's condition that would justify Hartford's decision.

The evidence Hackner relies upon to demonstrate actual bias, showing a significant conflict, is insufficient. The timing of the termination of Hackner's benefits was brought about after Hackner requested additional monies from Hartford for adaptive equipment. Based on a review of the file after this request, a Clinical Specialist concluded that Hackner's disabilities did not constitute a total disability under the Plan. After the Clinical Specialist's finding, Hartford engaged in a review of Hackner's file including discussions with Hackner's physicians. Only after the review did Hartford terminate Hackner's benefits. Furthermore, the timing of the termination of benefits in relation to Hackner's repaying certain overpayments does not demonstrate actual bias. Hackner does not dispute that he received some overpayment, and he

repayed such overpayments, at that time, without dispute. In fact, as of July 2000, Hackner relayed to Hartford that it had been "great" during the previous three-year period in relation to his disability claim.

Hackner's assertion that actual bias is demonstrated by Hartford's termination of benefits without a showing of any material improvement also fails to show actual bias. This argument attacks Hartford's reasons for termination of the benefits based on Hartford's review of the file, which is the basis of the underlying cause of action, not evidence of actual bias. Accordingly, Hartford's decision will be reversed only if its decision was arbitrary and capricious.

Under this standard, the Court does not decide whether it would reach the same conclusion or rely on the same authority. *See Mers,* 144 F.3d at 1021. The Court will not set aside the denial of benefits if the denial was based on a reasonable interpretation of the plan documents. The Court's "role is to determine whether the decision was completely unreasonable." *Mers,* 144 F.3d at 1021. As long as the plan administrator makes an "informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, *i.e.,* one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached," the decision of the administrator will be upheld. *See Exbom v. Central States, Southeast & Southwest Areas Health & Welfare Fund,* 900 F.2d 1138, 1143 (7th Cir. 1990).

Hartford asserts that the administrative record as a whole demonstrates that it properly determined that Hackner was not "Totally Disabled" under the definition of the Plan. Hartford relies on Hackner's high motivation to obtain a job; the vocational assessment which found that he was capable of performing several sedentary occupations based on his education, training, and

work history; its dispute that the medical evidence did not support the claim that chronic pain prevented Hackner from working in any capacity, including statements by Hackner's treating physicians that he could perform a sedentary occupation; Dr. Kazda's determination that Hackner could perform a sedentary occupation; and Hackner's ability to conduct a consulting firm in his home.

In contrast, Hackner asserts that evidence of Hartford's unreasonableness in terminating his benefits includes: Hartford's finding of Hackner not being totally disabled only six months after it had found that he was totally disabled; Hartford's decision was contrary to the Social Security Administration's finding that Hackner was disabled; evidence supported ongoing disability; his age; and his lack of significant improvement from the time of allowing benefits and the termination of benefits.

The parties do not dispute Hackner's receipt of disability benefits under the Plan through March 3, 1999, based on Hackner's depression nor that the disability benefits based on depression could cease on March 3, 1999, because of the twenty-four-month total lifetime benefit under the Plan for such benefits.

Hartford also found that Hackner was disabled as a result of coronary artery disease post coronary artery bypass graft. Accordingly, Hackner continued receiving disability benefits after March 3, 1999. In April 2000, Hartford also sent Hackner a letter advising him that a review of his claim was complete and that he remained totally disabled under the Plan. However, in July 2000, another review of Hackner's file was initiated after he requested adaptive equipment to assist him with his return-to-work efforts.

Based on this review of Hackner's file, a Clinical Specialist concluded that Hackner did

not appear to be totally disabled under the Plan because he was capable of sedentary occupations. In August 2000, Hartford spoke with Dr. Hudgins, one of Hackner's physicians, who also opined that Hackner could perform a sedentary occupation. Another of Hackner's physicians, Dr. Paulitsis, who diagnosed Hackner with chronic pain, deferred to Dr. Hudgins regarding Hackner's capacity to return to work. Dr. Jaffe, also one of Hackner's physicians, opined, in September 2000, after seeing him that same month, that Hackner was physically capable of sedentary work duties. Later in September, a review of Hackner's file indicated that Hackner was not totally disabled because he could work in a variety of sedentary occupations in light of his work experience, education, and training. The Rehabilitative Case Manager who made this finding noted that Hackner had reported he was consulting out of his home. Effective September 25, 2000, Hackner's disability benefits were terminated.

The above undisputed facts demonstrate that Hartford's decision to terminate Hackner's disability benefits after he had been receiving such benefits was made based upon subsequent reviews of Hackner's file and subsequent discussions with Hackner's physicians who believed that Hackner could perform sedentary occupations. While Hackner's pain continued and he continued to have health issues, these issues were also present when Hackner's own physicians opined that he could perform sedentary occupations or deferred to Hackner's physicians who had the same opinion. Furthermore, Hackner had admitted that he wanted to return to work and that he was consulting out of his home as well as attending seminars to assist him in his consulting business. Accordingly, the time of the termination of benefits after receipt of such benefits fails to demonstrate that Hartford's decision to terminate benefits in September 2000 was arbitrary and capricious.

Subsequently, Hackner's appeals of the denial of benefits were denied by Hartford. After receiving the first appeal, Hartford requested that Dr. Kazda review Hackner's file in addition to new medical evidence presented by Hackner. Dr. Kazda's report acknowledged Hackner's reports of chronic pain. However, Dr. Kazda disagreed with Dr. Blonsky, whom Hackner saw in January 2001, opining that Dr. Blonsky failed to identify any objective evidence or abnormalities that would preclude Hackner from performing sedentary occupations. Hartford had the right to rely on Dr. Kazda's report and assessment following his review of Hackner's file, including his disagreement with Dr. Blonsky. *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994) (insurer acted reasonably in denying benefits based on the acceptance of one medical opinion over another conflicting opinion). In the denial of this appeal, Hartford again noted Hackner's performance of a consulting business from his home and his attendance at numerous seminars.

Hackner appealed the denial of his appeal; and Dr. Kazda, once again, reviewed Hackner's file, including the additional documentation provided by Hackner's attorney. Dr. Kazda reported that the file and new information did not support the presence of a condition severe enough to preclude Hackner from returning to work in any occupation. Dr. Kazda again stated his disagreement with Dr. Blonsky's conclusions. This appeal was also denied.

Hackner appealed again. Hartford reviewed Hackner's file and denied this appeal. Hartford noted that the medical evidence failed to support the claim that he could not work in any position. In addition, based on its review of the claim, Hartford could not consider documents submitted on appeal which pertained to events that occurred after the termination of benefits unless they were relative to the time period prior to the termination of benefits. Accordingly,

Hartford could not consider Hackner's complaints of significant hip and knee pain or pain with sitting because these events pertained to matters that occurred outside the denial of his benefits. This last denial noted that, as of February 2000, Hackner reported "no discomfort with sitting and actually feels better with sitting and leaning forward".

In light of the deferential standard of review and the above facts, Hartford acted reasonably in terminating Hackner's disability benefits and denying his appeals. Hartford reviewed Hackner's files for each appeal, had the files reviewed by a physician, relied upon opinions by Hackner's own physicians, and explained its reasons for the denial of benefits as well as the denials of the appeals. While Hackner does not agree with the ultimate conclusion, and the conclusions of some of the physicians, Hartford was reasonable in relying on such conclusions and medical opinions. Accordingly, Hartford's Motion for Summary Judgment as to the termination and denial of disability benefits is granted. Hackner's Motion for Summary Judgment as to the termination and denial of disability benefits is denied.

Hackner also argues that Hartford made a mathematical error in its second request for reimbursement because it failed to take into account the previous reimbursement. However, a review of the mathematics shows that Hartford took into consideration the monies previously returned when the second recalculation was made. Accordingly, the mathematical computation was correct.

Lastly, Hackner argues that Hartford incorrectly reduced his benefit by the monies his son received through the Social Security Administration because his son was not as such his *dependent* since the child lives with Hackner's ex-wife and is not claimed by Hackner for federal income tax purposes. (Emphasis added). Hackner cites to *Decker v. Combined Ins. Co.*, 244

Neb. 281 (1993 (*Decker*) in support of his argument. However, unlike the policy at issue in this case, the *Decker* policy provided that disability payments would be reduced by the disability benefits to which the recipient's *dependents* were entitled to receive. *Decker*, 244 Neb. at 282. (Emphasis added). In the instant policy, the recipient's disability benefits are reduced by the benefits under the Social Security Act to which the recipient's *child* may be entitled to because of the recipient's disability. (Emphasis added). It is undisputed that Hackner's child received benefits under the Social Security Act to which he was entitled because of Hackner's disability. The provision in the instant Plan is unambiguous, and its terms must be interpreted in the ordinary and popular sense as would a person of average experience and intelligence. *See Kamler v. H/N Telecommunication Serv., Inc.*, 305 F.d 672, 680 (7th Cir. 2002). As such, Hartford properly reduced Hackner's disability benefit by the amount received by his child.

For the foregoing reasons, Hackner's Motion for Summary Judgment is denied. Defendant's Motion for Summary Judgment is granted.

Dated: December 11, 2002

JOHN W. DARRAH
United States District Judge